IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Deborah Wilson,<br><br>    Plaintiff,<br><br>v.<br><br>Vill. of University Park, an Illinois Municipal Corp., et al.<br><br>    Defendants. | Case No: 1:22-cv-06020<br><br>Judge Lindsay C. Jenkins<br><br>Jury Trial Demanded |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT OF FACTS**

COMES NOW Plaintiff Deborah Wilson, and pursuant to the Federal Rule of Civil Procedure Rule 56 and Local Ruler 56.1(a)(3), submits her Response to Defendants' Rule 56.1 Statement of Undisputed Material Facts.

1. Deborah Wilson (hereinafter "Plaintiff" "Wilson" or "Chief Wilson") is the former Police Chief of the Village of University Park. (Ex. 1: Wilson Dep. Tx. 10: 23 – 11:1) She was appointed Chief of Police at the April 30, 2020 Village Board Meeting, which was retroactive to March 24, 2020. (Ex. 2: April 30, 2020 Board Meeting Minutes).

   **Agreed.**

2. Defendant Ernestine B. Beck-Fulgham (hereinafter "Village Manager" or "Beck-Fulgham") was at all relevant times the Village Manager of the Village of University Park. (Ex. 3: Defendants' Answer to Amended Complaint ¶ 7).

   **Agreed.**

3. Defendant Joseph Roudez III (hereinafter "Mayor Roudez") was at all relevant times the elected Mayor of the Village of University Park. (Ex. 3 ¶ 8).

   **Agreed.**

4. Defendant the Village of University Park is a home rule unit of local government located in Will County, Illinois which is situated in the Northern District of Illinois. (Ex. 3 ¶¶ 4, 9).

**Agreed.**

5. Plaintiff's Amended Complaint brings claims pursuant to the United States Constitution and the laws of the United States including 42 U.S.C. 2000e(3)(a) and the First and Fourteenth Amendments to the U.S. Constitution. [Doc. 020] The remaining state law claims are related to the Federal claims and form the same case or controversy.

**Agreed that Plaintiff's Amended Complaint asserts such claims, but disputes that this list represents every claim that Plaintiff alleged in her First Amended Complaint. The First Amended Complaint includes the following counts:**

**1. Count I: 42 U.S.C. § 2000e(3)(a) Retaliation - Wilson v. Village of University Park, Illinois**
**2. Count II: IHRA Based on Retaliation - Wilson v. Village of University Park, Illinois**
**3. Count III: Due Process Violation (Board of Trustees) - Wilson v. Defendants Village and Beck-Fulgham**
**4. Count IV: Violation of Civil Rights – Due Process (BOFPC) - Wilson v. Defendants Village and Beck-Fulgham**
**5. Count V: Writ of Mandamus – (State Law Claim) - Wilson v. Village of University Park, Illinois**
**6. Count VI: 42 U.S.C. § 1983 Claim for Deprivation of 1st Amendment Rights & for Wrongful Termination of Employment - Wilson v. All Defendants**
**7. Count VII: 42 U.S.C. § 1983 Deprivation Based on Retaliation - Wilson v. All Individual Defendants**
**8. Count VIII: Monell Claim - Wilson v. Village of University Park, Illinois**
**9. Count IX: Violation of the Whistleblower Act (740 ILCS §174/1) - Wilson v. All Defendants**
**10. Count X: Replevin (State Law Claim) - Wilson v. Defendant Village and unknown Village employees**
**11. Count XI: Violation of Illinois Wage Payment & Collection Act - Wilson v. Defendant Village**
**12. Count XII: Indemnification - Wilson v. Defendant Village**

**Agreed to the remaining statements of fact of #5.**

**WILSON'S EMPLOYMENT WITH THE VILLAGE OF UNIVERSITY PARK**

Prior to her appointment as Police Chief, Wilson served as deputy chief, commander, sergeant and patrolman with the University Park Police Department. (Ex. 1: 11: 7 -13: 12)

2

    **Agreed.**

6. Wilson's service entry date with the Police Pension Fund was January 4, 1999. (Ex. 4: University Park Police Pension Fund Report p. 34) At the time she was appointed Chief of Police on March 24, 2020 she was 52 years old and had 21 years of creditable service. (Id.).

    **Agreed that Wilson's entry date for the police pension fund was January 4, 1999. Agreed that Exhibit 4 purports to be the Village's Pension Fund Report. Agreed that Wilson was appointed as the Chief on March 24, 2020 and was 52 years old. Dispute that Wilson had 21 years of creditable service. She has 23 years of service. See DSOF #45, Wilson Affidavit ¶2.**

7. Wilson never signed a contract, and there was no contract governing the terms of her employment as Police Chief. (Ex. 1: 18: 21 -19:2; 225: 15-18).

    **Agree that Wilson never signed a written contract, but dispute that there was no agreement governing the terms of her employment as police chief. Wilson Affidavit ¶3.**

### KEISHA KITCHING INCIDENT

8. In October or November of 2021 Wilson observed a Village employee named Keisha Kitching (hereinafter "Kitching") and the Village Manager get caught together in the doorway of a conference room. (Ex. 1: 235: 20-24) Wilson saw the Village Manager smack Kitching on the butt and giggle. (Id. 234: 17-20) Wilson later told Kitching she did not have any problem "saying what I saw." (Id. 239: 5-9).

    **Agreed.**

9. Kitching filed five charges with the EEOC and IDHR and each one has been investigated and administratively closed based upon lack of substantial evidence. (Ex. 5: IDHR Notices of Dismissal and Investigation Reports) Wilson never actually testified at any proceeding on behalf of Kitching (Ex. 1: 239: 22-24); never provided an affidavit (Id. 240: 1-4); never participated in an EEOC conference call (Id. 241: 2-4); and never told anyone else that she would testify on Kitching's behalf (Id. 241: 5-8). Wilson is not identified as a witness for Kitching in any IDHR or EEOC documents. (Ex. 5 pg. 27, 44, 70, 100, 117)

    **Plaintiff agrees that Exhibit 5 purports to be Kitching's IDHR dismissal notice and investigation reports, but disputes this Exhibit to the extent that it has not been authenticated through any witness. Plaintiff is further without any independent knowledge of how many charges Kitching filed with the EEOC and Defendant did not attach a copy of her EEOC charge. Plaintiff does not have independent knowledge that she was never identified as a witness for Kitching in any IDHR or EEOC**

3

documents. **Plaintiff knows that she has been identified as a witness in Kitching's Will County Lawsuit, Case Number:** *Kitching v. Village of University Park and Beck Fulgham*, **2022LA000548 (pending). Plaintiff agrees to the rest of the facts in #9.**

10. Beck-Fulgham called Wilson in November and asked her what she thought she saw in regard to Kitching. (Ex. 1: 243: 14-16) Beck-Fulgham told Wilson that Wilson did not see Beck-Fulgham slap Kitching on the butt, but never told Wilson not to testify. (Id. 146: 18-20).

    **Plaintiff disputes the characterization that Beck-Fulgham never told her not to testify. Specifically, Kitching informed Wilson that "we have a date coming up" (referring to her EEOC charge). Wilson Affidavit ¶4. Wilson further testified in her deposition that Beck-Fulgham called Wilson up shortly thereafter and said "what is it that you -- you think you know about this Keisha Kitching thing? What do you -- what do you plan on saying?" Wilson further testified that "I don't think you should be talking to me about this … and further testified that Beck-Fulgham "said, well, what is it? I don't know why you're saying that -- that you saw something." Wilson replied "I said, I know what I saw. You know, I saw you smack her on the butt." Beck-Fulgham responded "no, I'm not a lesbian. And, you know, I -- no, I'm -- I'm married and I'm not -- I don't -- I wouldn't do anything like that. You didn't see me do that." Wilson testified that she repeated that she knew what she saw and that they should not be discussing this matter. Beck-Fulgham again told Wilson that "you did not see me smack Keisha on the butt." Again, Wilson reiterated that they should not discuss this matter. At that point, Wilson testified that Beck-Fulgham said "I'm sorry." Wilson Dep. pp. 242:24, 243-244. Wilson perceived Beck-Fulgham's repeated telling her that she did not see it as trying to alter her testimony in an upcoming EEOC proceeding. Wilson Affidavit ¶ 5.**

11. In late October or early November Wilson separately told University Park residents Mildred Morgan and Star Lawson on the phone that she saw Beck-Fulgham smack Kitching on the butt. (Ex. 1: 275: 2-9; 275: 24- 276:6; 277: 1-9)

    **Agreed.**

    NOVEMBER 4, 2021 GOLF COURSE INCIDENT

12. At all times relevant, the University Park Golf and Conference Center (hereinafter the "Golf Club") was owned by the Village of University Park but managed by CHW Management Group (hereinafter "CHW") pursuant to a management agreement. (Ex. 2: ¶ 25; Ex. 6: CHW Management Agreement) Sonia Coffee (hereinafter "Coffee") was the manager of CHW. (Ex. 1: 32: 18-23)

    **Dispute to the extent that this fact asserts that the Golf Course was only managed according to Exhibit 6. Agreed to the remaining facts in #12.**

4

13. Section 3.6 of the management agreement provides: "CHW shall be responsible for obtaining, maintaining and repairing all equipment and shall keep complete records of maintenance on each piece of equipment, and shall make available all records and all equipment available for inspection by the Owner, with at least 72 hours notice allowing CHW to coordinate. (Ex. 6: § 3.6).

    **Agree that this section purports to be §3.6 of CHW's management agreement, but dispute to the extent that this section implies that no Village property would be stored in the Golf Course's garage as was the Village's past practice. Wilson Affidavit ¶6.**

14. Wilson knew there was a contract governing the relationship between the Village and CHW, but Wilson did not attempt to obtain or review the agreement. (Ex. 1: 88: 18-91: 18)

    **Agree that Wilson knew that there was a contract governing the relationship between the Village and CHW and that she did not attempt to obtain or review the agreement.**

    **Dispute to the extent that Fact 14 implies that Wilson had an obligation to obtain or review the Agreement. Plaintiff clarifies that on November 4, 2021, she spoke with Chellios (former fire chief and then-acting Village Manager) and Byther (former Director of Public Works) about whether there were any instructions against their presence, especially given the occurrence of a crime. Neither was aware of any such instructions or reasons why they would not be allowed into the garage. They discussed the need for giving notice before coming over, but there were no directives about not being there at all. Both Chellios and Byther confirmed they were never told not to come to the Golf Course. (Wilson Dep. p. 89:8-24; Wilson Affidavit ¶¶7-8). Chellios testified that he has never seen the contract between the Village of University Park and CHW Management (Chellios Dep. p. 45:1-4). He never received any directives or orders about making an appointment before visiting the golf course (Chellios Dep. p. 45:5-8).**

15. On November 4, 2021 Derrell Byther, then director of public works for the Village, (hereinafter "Byther") called Chief Wilson on her work cell phone and asked her to come to the Golf Club because he was having a verbal dispute with a CHW employee. (Ex 1: 31: 16-18; 40: 7-19) Wilson arrived and learned that Byther went to the Golf Club to retrieve a "tire changer" from the Golf Club garage because the one in public works was broken. (Id. 45: 10-12; 50: 10-12)

    **Agreed.**

16. A tire changer is a large and heavy piece of equipment, approximately 500 – 1000 pounds used to remove or place a tire onto a rim. (Ex. 7: Roudez Dep. Tx. 252:3-5; 21- 253:4) It is not a portable device. (Id. 252: 8-11)

5

**Agreed that this fact summarizes Roudez' testimony. Wilson disputes this fact to the extent that it implies that she had knowledge as to the weight or mobility of a tire changer when she arrived at the Golf Course on November 4, 2021. (Wilson Dep. pp. 45:23-24, 46:1-20). Agree to the remaining facts in #16.**

17. An employee of CHW named Putnam told Wilson and Byther that the tire changer was not in the garage and that Wilson and Byther could not go in the garage. (Ex. 1: 79: 8-15) Putnam called Coffee and placed her on speakerphone. (Id. 53: 13-16; 54: 1) Coffee told Wilson to get out of the building and that she was trespassing. (Id. 54: 3-4)

    **Agreed.**

18. Coffee called 9-11 and asked the Will County Sheriff to respond to the scene. (Ex. 1: 7: 6-11) Wilson believed it was illegal for Coffee to dial 9-11 because Wilson was a police officer and already on scene. (Id. 67:5-9)

    **Agreed.**

19. Wilson had no personal knowledge that the tire changer was inside the garage and her only basis for this belief was what Byther told her. (Ex. 1: 78: 18- 79:1) Wilson did not believe there was an emergency that necessitated retrieving the tire changer. (Id. 81:13 – 17).

1. **Wilson agrees that she lacked personal knowledge that the tire changer was inside the garage but disputes that Byther was the only one who informed her that the tire changer was located inside the Golf Course garage. Marteen the Village's mechanic also told her that the Village's spare tire changer had been stored in the Golf Course garage for years (Wilson Dep. pp. 47:20-24, 48:1-4, Wilson Affidavit ¶9)**.

20. Wilson decided she was going to force entry into the Golf Club garage and drove back to the police station, retrieved a crowbar and asked two additional officers to assist her. (Ex. 1: 71: 11-17. She did not attempt to obtain a warrant for entry into the garage or review the terms of the contract between the Village and CHW for the storage and use of equipment. (Id. 81:21-24; 91: 12-18)

    **Object to the term "force entry." Agree that she did not obtain a search warrant, but dispute this fact to the extent that it implies that she needed a search warrant for entry into the garage. Agreed to the remaining facts in #20. (Chellios Dep. p. 81:10-16, Exhibit M)(Chellios testified that he left the decision of what to do at the golf course to the discretion of Chief Wilson and summarized this in his November 4th email to the trustees). Agree to the remaining facts of #20.**

6

21. Wilson attempted to use the crowbar to access the garage but it would not catch the side of the door. (Ex. 1: 75: 19-24) Wilson claims she was investigating the crime of "them obstructing me from doing- figuring out what's going on." (Id. 74: 11-14) A public works employee gained access to the garage and there was no tire changer machine located inside. (Id. 255: 18- 256:3)

    **Agreed.**

22. Wilson decided to make a report because she was going to turn the information over to the Village Manager because it involved employees while they were working. (Ex. 1: 121: 19 – 24) Wilson completed a police report for the November 4, 2021 incident and listed the offense as "Disorderly conduct- actions alarm or disturb another, provoking breach of peace" and identified the suspect as "Sonia L. Coffee." (Id. 97: 15-24; 98: 11-13; Ex. 8: Nov. 4, 2021 incident report).

    **Dispute that Wilson completed her police report on November 4, 2021. (Wilson Dep. p. 126:12-24). Agree to the remaining facts in #22.**

23. The report does not contain any identifying information beyond the name of the individual that was in a verbal dispute with Byther. (Ex. 1: 103: 16 – 19; Ex. 8) Wilson obtained this information but never put it in her report. (Ex. 1: 105: 3-5) The report does not contain any information about Wilson's entry into the garage. (Id. 105: 15-16; Ex. 8) The narrative is silent as to Sonia Coffee's alleged disorderly conduct. (Ex. 1: 103: 23- 104: 2; Ex. 8) Wilson had Byther and a public works employee complete statements and also spoke to a mechanic about the tire changer but did not include any of this information in her report or complete any supplemental reports. (Ex. 1: 108: 6-7; 109: 4-6; 109: 14 – 20).

    **Agreed.**

24. Wilson had a "soundex" search performed through LEADS to find Coffee's date of birth or driver's license number and nothing came back. (Ex. 1: 98: 19- 99: 4; 100: 20-21) Wilson claimed she could not "close out" her report without Sonia Coffee's date of birth. (Id. 116: 19-22) While the report was "administratively closed" without Coffee's date of birth, it could not be sent for universal coding for statistics purposes. (Id. 117: 9-15) As the Chief of Police, Wilson had the ultimate approval authority for the case report. (Id. 128: 22- 129:1)

    **Agreed.**

25. After November 4, 2021, Wilson took numerous steps to "identify" Sonia Coffee to "close out" her report. She tried to run her license plate and it came back leased. (Ex. 1: 131: 23 – 132: 2) She went to the golf course but was told Coffee was not there. (Id. 132: 3-6) She attempted to call Coffee (Id. 136: 4-6)

**Agreed.**

26. On November 29, 2021 Coffee's attorney sent an email to Wilson, the Mayor and Village Manager indicating he had instructed Coffee not to meet with Wilson. (Ex. 9: Email Charles Krugel November 29, 2021) Coffee's attorney also told Wilson on the phone that he would need to be present for any conversation with Coffee. (Ex. 1: 136: 9-12).

    **Plaintiff objects to Ex. 9 and the assertions made because Exhibit 9 is not properly authenticated with any supporting testimony or affidavit. Federal Rule of Evidence 901. Neither Krugel nor Coffee are parties to this lawsuit, and Ex. 9 constitutes inadmissible hearsay because it is an out-of-court statement offered for the truth of the matter asserted and no hearsay exception applies. Wilson agrees that Coffee's attorney told her on the phone that he would need to be present if Wilson asked Coffee any questions, but clarifies that this is an incomplete portion of Wilson's response which is on page 136:1-24.**

27. On December 15, 2021 CHW made a written complaint to the Mayor and Village Manager about Village employees behavior on November 4, 2021 at the Golf Club. (Ex. 10: Email Charles Krugel December 15, 2021) The complaint alleged that their actions caused damage to the door. (Id.) CHW later submitted an invoice for repairs to the door for $256.94. (Ex. 11: Invoice)

    **Dispute that Exhibit 10 represents only one Email from Charles Krugel as the Email thread also includes an Email from December 29, 2021. Plaintiff objects to Ex. 9 and the assertions made because Exhibit 9 is not properly authenticated with any supporting testimony or affidavit. Federal Rule of Evidence 901. Neither Krugel nor Coffee are parties to this lawsuit, and Ex. 9 constitutes inadmissible hearsay because it is an out-of-court statement offered for the truth of the matter asserted and there is no exception to the hearsay rule. Exhibit 11 has also not been properly authenticated by anyone with personal knowledge as to the contents of the invoice. Federal Rule of Evidence 901.**

WILSON SPEAKS TO LAW ENFORCEMENT

28. Wilson believed something unlawful was happening at the Golf Club because Sonia Coffee did not have any experience with a golf course and Wilson believed that Coffee got an extraordinary deal (Ex. 1: 253: 21- 254: 1), the tire changer was missing from the golf course garage, (Id. 254: 12-14) she did not see a new lawnmower in the garage after the Village paid for one, (Id. 256: 1-3) the golf course was never open, (Id. 272: 14-16) and Coffee would come to the Village to pick up checks (Id. 281: 3-4).

    **Agreed that these facts are a portion of the reasons why Wilson believed something illegal was occurring at the Golf Course, but disputes the characterization of these facts. Specifically, Wilson disputes the characterization that "Coffee would come to**

8

**the Village to pick up checks" because Wilson's testimony was that Roudez III and Beck-Fulgham were "cutting checks without [the Board's] permission … and that Sonia Coffee just comes over and demands her money, you know, demands a check. All these things are just completely out of the norm. (Wilson Dep. pp. 258:8-16; 280:11-24; 281:1-7). Wilson clarifies that she believed Coffee "got an extraordinary deal" because of her personal relationship to Joseph Roudez III—which was that her boyfriend was a longtime friend of Roudez IIII. (Wilson Dep. pp. 253:3-24, 254:1-7).**

29. Wilson did not oppose these alleged unlawful practices to the Beck-Fulgham or the Mayor and did not tell Beck-Fulgham she thought CHW stole the tire changer and lawnmower. (Ex. 1: 261:24 – 262: 6; 262:14-17; 262: 21-23; 273:13-18; 273: 20-274:1) Mayor Roudez did not know Wilson had spoken to the FBI or the Will County State's Attorney's Office. (Ex. 7: Mayor Roudez Dep. Tx. 225: 13-16)

   **Object to the phrase "stole the tire changer and lawnmower" as argumentative. Agree that Wilson did not oppose the unlawful practices to Roudez III. Dispute that Wilson never raised the issue of the missing tire changer to Beck-Fulgham who told her she would not get involved. Wilson Affidavit ¶ . Ernestine Beck-Fulgham knew that Wilson talked to the FBI and the State's Attorney's Office in November or December 2021.**

   **Dispute that Roudez did not know that Wilson spoke to the FBI or the Will County State's Attorney's Office because Wilson testified that the Defendants and Board of Trustees discussed that Wilson went to the FBI and the Will County State's Attorney's Office during open session after she was put on administrative leave (Wilson Dep. pp. 270:3-24, 271:1-4). Brooks knew that Wilson had gone to the FBI and told Beck-Fulgham that Wilson had contacted the FBI (Exhibit G - Brooks Dep., pp. 86:20-24, 87:7-24, 88:1-19).** Wilson spoke about going to the FBI and the State's Attorney's Office in her Interrogation. (Exhibit D. Wilson Dep. p. 272:22-24, 273:1-6; Wilson Affidavit ¶19).

30. Wilson spoke to the Will County State's Attorney's Office in late October early November of 2021 and spoke to the FBI once in early December 2021. (Ex. 1: 258: 17-259:3) She did not tell other people that she spoke to law enforcement. (Id. 259: 13-17). She provided the State's Attorney's Office and FBI with Village Board meeting packets, board meeting videos and the CHW Management agreement. (Id. 281: 24 – 282: 6; 282: 20-22) Wilson believed CHW was being paid for nothing, but she does not know what law that violates. (Id. 283: 19-20).

   **Agreed, but clarify that the FBI told Wilson to get Sonia Coffee identified. (Wilson Dep. p. 360:1-24).**

9

DECEMBER 16, 2021 GOLF COURSE INCIDENT

31. On December 16, 2021, Wilson drove by the Golf Club and saw Coffee's car in the parking lot. (Ex. 1: 142: 4-7). Wilson went inside the Golf Club to "try and get an identification on Sonia" (Id. 145: 10-13) and to give her the opportunity to give a statement regarding stolen property. (Id. 188: 22- 189:2).

   **Agreed.**

32. Coffee walked out of her office and Wilson approached her. (Ex. 1: 149: 2-5; Ex. 12: Golf Course Video Surveillance December 16, 2021 Pro Shop at 00:08). Wilson told Coffee she just came to identify her and wanted to finalize everything that was going on. (Ex. 1: 150: 20-24). Wilson also told Coffee she was not free to leave. (Id. 172: 16 – 20). Wilson believed she had probable cause to arrest Coffee for making a false police 911 call on November 4, 2021, but she was not going to arrest her. (Id. 173: 11-14; 15-17; 177: 12-16)

   **Agreed.**

33. Coffee told Wilson she was not going to talk to Wilson. (Ex. 1: 151: 2). Coffee's attorney was not present. (Id. 151: 24-152: 1) Coffee turned around and walked back towards her office and Wilson followed her. (Id. 197: 3-6; Ex. 12 at 00:55) Coffee turned back towards Wilson and put her hand up. (Ex. 12 at 1:01) A CHW employee named Mathus got between Wilson and Coffee. (Ex. 1: 198: 15-17; Ex. 12 at 1:44).

   **Agreed, but object to the reference to Ex. 12 as 00:55 because it was not the time that Wilson's testimony reflects. Wilson further disputes the characterization of events in Ex. 12 at 1:01, Wilson testified that she did not know what Coffee was signaling and that she thought she was saying something, but she did not know. (Wilson Dep. p. 197:19-24). Wilson agrees to the remaining facts of #33.**

34. Coffee tried to quickly enter her private office and close the door. (Ex. 1: 153: 3-4; Ex. 12 at 01:46) Wilson did not necessarily believe there was any evidence of a crime inside the office. (Ex. 1: 175: 17-19) Wilson attempted to push Mathus out of the way and put her foot in the door and stopped the door from closing. (Ex. 1: 199: 12-13; Ex. 12 at 01:48)

   **Wilson disputes that her testimony regarding Ex. 12 01:46 is accurately reflected by her testimony on page 153 of her deposition. Wilson testified about 01:46 on pages 198-200 of her deposition. Dispute that Wilson testified that she "pushed Mathus out of the way. (Wilson Dep. p. 199:12-21). Videos and audio may be authenticated by personal knowledge of a person present during the taping as well as by circumstantial evidence. Fed. R. Evid. 901(b)(2), (4), (5). Accordingly, this statement of fact should be stricken to the extent that such "portions of the facts amount to rank speculation about another individual's state of mind, and thus, strikes them from the summary**

**judgment record." See Fed.R.Evid. 602." Afridi v. BNSF Railway Company, 1:18-cv-08205, November 2, 2022. Wilson agrees to the remaining facts of #34.**

35. Coffee was trying to close the door, but Wilson pushed it open and Coffee fell onto Wilson. (Ex. 13: Golf Course Video Surveillance December 16, 2021 Interior Office at 00:08) Mathus got between Coffee and Wilson. (Ex. 13 at 00:12) Wilson then pushed and shoved Mathus as she lunged towards Coffee. (Ex. 13 at 00:17-24)

    **Object to Ex. 13 as an improper and subjective characterization of the events in Exhibit 13. Dispute that Wilson "pushed" and "shoved" Mathus while she "lunged towards Coffee" because Defendants provide their recitation of the facts and include argumentative words such as "pushed, shoved, and lunged." Accordingly, this statement of fact should be stricken to the extent that such "portions of the facts amount to rank speculation about another individual's state of mind, and thus, strikes them from the summary judgment record." See Fed.R.Evid. 602." Afridi v. BNSF Railway Company, 1:18-cv-08205, November 2, 2022.**

36. Wilson called for backup and instructed the officers that arrived on scene to place Mathus and Coffee under arrest. (Ex. 1: 161: 12-23) Wilson completed a police report and indicated she went to the Golf Club to follow up on a stolen property case. (Id. 188: 2-7; Ex. 14: December 16, 2021 Incident Report) Wilson wrote in her report that Mathus turned around and shoved her with two hands in her chest. (Ex. 14) Wilson Agreeted in her deposition that Mathus did not shove her chest with his hands. (Ex. 1: 200: 21-201:1; 201: 16-21).

    **Agree with the facts of #36, but clarify that Wilson testified that Mathus attempted to pin her against the door. (Wilson Dep. p. 200:1-14).**

37. Mathus and Coffee were charged by the Will County State's Attorney's Office with aggravated battery. Wilson did not have the authority to bring charges or dismiss these charges. (Ex. 1: 265: 5-24)

    **Agreed, but clarify they were charged with aggravated battery to a police officer.**

38. On April 13, 2023 Judge Carmen Goodman of the Circuit Court of Will County granted Mathus and Coffee's motion for a directed finding in their criminal trial and found them not guilty. (Ex. 15: Criminal Trial Transcript 122: 7-10; 124: 4-7).

    **Agreed.**

WILSON'S ADMINISTRATIVE LEAVE AND TERMINATION

39. Around 3:00 or 4:00 pm on December 16, 2021, Wilson went to the Village Hall and met with the Mayor and Village Manager. (Ex. 1: 206: 5-7; 207: 7-9) The Village Manager

11

gave Wilson a letter placing her on paid administrative leave pending an investigation. (Id. 209: 3-4; Ex. 16: Administrative Leave Letter).

**Agreed.**

40. Wilson received a box of things from her office but she was missing several items like her weapons, leather jacket and raincoat. (Ex. 1: 211: 16-20) She does not know whether the Village has possession of these items. (Id. 214: 9-11; 214: 23- 215: 3).

**Agreed.**

41. The Village conducted an internal investigation and interrogated Wilson. (Ex. 1: 217: 10-11; 218: 15-19) The investigation concluded that Chief Wilson's conduct from November 4, 2021 to December 16, 2021 violated numerous Policies and Procedures of the University Park Police Department. (Ex. 17: Investigation Report Summary)

**Wilson objects to Ex. 17 as inadmissible hearsay because the author of the report never testified to the contents of the report, Beck-Fulgham lacked any personal knowledge of the author of the report's investigatory steps, process, or method, and this report is not subject to the business record exception because it was prepared in anticipation of litigation.**

42. On February 17, 2022 Wilson filed a complaint with the EEOC. Mayor Roudez had not seen a copy of the EEOC filing prior to his deposition on November 27, 2023 and could not recall whether he was told about the EEOC charge. (Ex. 7: Roudez Dep Tx. 223: 19-224: 15).

**Agree that Wilson filed an EEOC charge on February 17, 2022. Agree that the remaining statements represent Roudez III's deposition testimony.**

43. On March 22, 2022 an executive session of the University Park Board of Trustees meeting was held to discuss Wilson's employment. (Ex. 18: March 22, 2022 executive session recording). The Board of Trustees was provided with the investigation report and the Village Manager recommended that Wilson be given the option to retire or be terminated. (Ex. 18 at 42:37). Ultimately a consensus was given that Wilson be given the option to retire or be terminated. (Ex. 18 at 59:20 – 1:05:00)

**Wilson disputes that the Board had a consensus to give her the option to retire or be terminated. No official Board vote occurred and a consensus is not a valid Board action. Wilson agrees that the remaining facts represent Ex. 18's recording.**

44. Thereafter on April 1, 2022 Beck-Fulgham issued Wilson a letter indicating the Village would accept her retirement if Wilson submitted a written notice of retirement by April 5,

12

2022; otherwise Wilson would be considered terminated. (Ex. 19: April 1, 2022 Termination Letter) Wilson did not submit a notice of retirement and was terminated for cause as of 5:00 pm on April 5, 2022. (Ex. 1: 221: 20- 222: 1; Ex. 19)

**Wilson agrees that Ex. 19 is a copy of the letter Beck-Fulgham issued to Wilson and that she did not submit a notice of retirement. Wilson disputes that she was terminated for cause because there was never any official board vote to remove her as police chief or terminate her as a police officer.**

45. Wilson was 54 years old and had 23 years of creditable service towards her pension at the time she was terminated. (See ¶ 7).

    **Agreed, but dispute this fact to the extent that it contradicts Wilson's pensionable service credit in Fact #7.**

46. Wilson received a payout after her termination. (Ex. 1: 222: 24 – 224: 3) She believes she was also entitled to a payout for half her sick time and her floating holidays according to the policy manual as well as a severance package according to ordinance. (Id. 223: 21- 224: 2; 225: 3 – 6; 225: 19-24)

    **Object to the term "payout" as vague and ambiguous. Agree to the remaining facts of #46.**

47. The Village of University Park Policy Manual states that "Sick leave is cumulative, but not reimbursable." It does not contain any provisions regarding floating holidays. (Ex. 20: University Park Policy Manual pg. 12).

    Agreed.

Respectfully submitted,

Deborah Wilson

Gianna R. Scatchell, Esq.
GB LAW
1821 W Hubbard Street, #209
Chicago, Illinois 60622
P: (312) 248-3303
E: gb@lawfirm.gs

**CERTIFICATE OF SERVICE**

13

The undersigned attorney hereby certifies that she served the foregoing Response in Opposition to Defendants' Motion for Summary Judgment on all counsel of record via this Court's CM/ECF filing system on June 17, 2024, and that all such counsels are registered e-filers.

/s/ Gianna Basile

14