**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Deborah Wilson,

    *Plaintiff,*

v.

Village of University Park, *et* al.,

    *Defendants.*

No. 22 CV 6020

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

Plaintiff Deborah Wilson brings this lawsuit against the Village of University Park; the Village Manager, Ernestine Beck-Fulgham; and the Mayor, Joseph E. Roudez, III. Following her termination as the University Park Police Chief, Wilson brought a variety of claims under Title VII, the Fourteenth Amendment, and various Illinois statutes. [Dkt. 20.] [1] Defendants moved for summary judgment as to all twelve counts in Wilson's operative complaint. [Dkt. 58.] Wilson seeks summary judgment on two Due Process Claims. [Dkt. 60.] For the reasons explained, the Court denies Wilson's motion and grants in part and denies in part Defendants' motion.

## I.    Local Rule 56.1

The Court first discusses Local Rule 56.1, which bears on the facts properly before the Court. Along with their summary judgment briefs, the parties filed statements of material facts as required by Local Rule 56.1. [Dkts. 73, 81, 87.] The statements serve a valuable purpose: they help the Court in "organizing the evidence

---

[1]    Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

and identifying disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). A party that fails to comply with Local Rule 56.1 does so at their own peril. *Petty v. City of Chi.*, 754 F.3d 416, 420 (7th Cir. 2014). Each statement of fact must be concise. L.R. 56.1(d)(1). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." L.R. 56.1(e)(3).

A party responding to an adversary's statement of facts may make objections based on admissibility, with the argument for the propriety of the objection in its brief. L.R. 56.1(e)(2) ("If a party contends that its opponent has included objectionable or immaterial evidence or argument in a LR 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief.") If the Court overrules the objection and the party does not otherwise dispute the fact, however, the fact is deemed admitted. *Id.* "To be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017) (cleaned up). The Court may require strict compliance with Local Rule 56.1. *Johnson v. Edward Orton, Jr. Ceramic Found.*, 71 F.4th 601, 611 n.13 (7th Cir. 2023).

Wilson flouted several aspects of this rule with her filings. For example, her Local Rule 56.1(a) statement references eight exhibits, but six of them were not

attached to the statement, which Defendants observe in their Rule 56.1(b)(3) responses. [Dkt. 61, 73.] Her statement of additional facts also cites to material she did not include in the record. [*See, e.g.*, Dkt. 87, ¶ 34, referencing "Exhibit O" which was not included at dkt. 77.] Her responses to many of Defendants' asserted facts fall far short of actually disputing the asserted fact. L.R. 56.1(e)(3). For example, in her response to Defendants' asserted fact at paragraph 28, Wilson responds by citing to her affidavit, but she does not identify where the evidence that shows the dispute can be found. [Dkt. 81, ¶ 29, citing "Wilson Affidavit ¶ ".]

The Seventh Circuit "has repeatedly recognized that district courts may require exact compliance with their local rules," including the "local rules governing summary judgment." *Allen-Noll v. Madison Area Tech. Coll.*, 969 F.3d 343, 349 (7th Cir. 2020) (collecting cases). Consistent with the purpose of Local Rule 56.1, however, the Court has "broad discretion" to relax or enforce strictly local rules governing summary judgment practice. *Edgewood Manor Apt. Homes, LLC v. RSUI Indem. Co.*, 733 F.3d 761, 770 (7th Cir. 2013); *see also Cracco v. Vitran Express Inc.*, 559 F.3d 625, 632 (7th Cir. 2019).

Despite these issues, and because the Court prefers to decide cases on the merits, not on technicalities, the Court will not disregard Wilson's Statement of Facts or Statement of Additional Facts entirely. Where plagued by these types of issues, the Court disregards Wilson's factual assertion, and where appropriate, treats Defendants' assertion as undisputed.

3

## II.    Background

The Court draws on the parties' Local Rule 56.1 statements to recount the facts, which are undisputed unless otherwise noted. The Court presents the facts in the light most favorable to Wilson as the non-moving party. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023).

For pension purposes, Wilson started with the Village of University Park police department as a police officer in January 1999; she was appointed Chief in March 2020. [Dkt. 81 at ¶ 6.] Wilson and the Village did not have a formal contract outlining her service as Chief. [*Id.* at ¶ 7; Dkt. 87 at ¶ 4.] The Village owns the University Park Golf and Conference Center (Golf Club), but contracts with a management company to run it. [Dkt. 81 at ¶ 12.] Sonia Coffee was the Golf Club's manager. [*Id.*]

*Kitching Incident:* In October or November 2021, Wilson witnessed Village Manager Ernestine Beck-Fulgham smack the bottom of a Village employee named Keisha Kitching. [*Id.* at ¶ 8.] Kitching brought charges with the EEOC and IDHR, but Wilson did not testify at any proceedings or provide an affidavit. [*Id.* at ¶ 9.] Wilson never told anyone she would testify on Kitching's behalf, and Wilson was never informed by anyone that she had been identified as a witness for Kitching in connection with those proceedings. [*Id.*] Following the Kitching incident, Beck-Fulgham and Wilson spoke by telephone, but the parties dispute what was said during the call, whether Beck-Fulgham told Wilson not to testify about the incident, or whether Beck-Fulgham implied that Wilson had not seen the smack. [*Id.* at ¶ 10.] It is undisputed that Wilson separately told two University Park residents that she saw Beck-Fulgham smack Kitching. [*Id.* at ¶ 11.]

4

*Tire-Changer Incident*: On November 4, 2021, Wilson received a call from the Village director of public works, Darrell Byther, asking Wilson to come to the Golf Club regarding a dispute Byther was having with another employee, Blake Putnam. [*Id.* at ¶¶ 15, 17.] When Wilson arrived, she learned that Byther wanted to use a tire-changer machine he believed was in the Golf Club garage, but Putnam would not let Byther access the garage. [*Id.*] When Byther and Wilson would not leave, Putnam called his manager—Sonia Coffee—and placed Coffee on speakerphone. [*Id.* at ¶ 17.] Coffee told Wilson and Byther that they were trespassing and to leave the building. [*Id.*] Coffee called 9-1-1 and requested the Will County Sheriff to come to the scene. Wilson believed Coffee's call to authorities was illegal because "Wilson was a police officer and already on scene." [*Id.* at ¶ 18.]

It is not disputed that Wilson did not know whether the tire changer was in the garage, but she returned to the police station to retrieve a crowbar. She then attempted, unsuccessfully, to use it to open the garage. Another public works employee later gained access to the garage. There was no tire changer machine inside. [*Id.* at ¶¶ 19–21.]

Following these events, Wilson prepared a case report for the incident to provide to Village Manager Beck-Fulgham. The report listed "disorderly conduct" as the subject of the offense, and listed Coffee's name as the suspect. [*Id.* at ¶ 22; Dkt. 59-7.] Wilson had Coffee's name, but she could not find her birth date or license plate number. [Dkt. 81 at ¶¶ 22–24.] Wilson could not "close out" the report without

5

Coffee's birthdate, so she attempted to obtain this information by trying to find Coffee at the Golf Club and by calling Coffee, among other ways. [*Id.* at ¶ 25.]

A few weeks later on November 29, 2021, Wilson received a phone call from Charles Krugel, a lawyer who advised that he represented Coffee, and that Wilson could not ask Coffee any questions without him present. [*Id.* at ¶ 26.] Krugel also sent an email to Wilson, Mayor Roudez and Beck-Fulgham relaying the same information. [*Id.*; Dkt. 59-8.][2]

*Wilson Speaks with Law Enforcement:* Wilson "believed something unlawful was happening at the Golf Club," based on items Wilson believed might have been missing from the Golf Club garage. She also suspected that Mayor Roudez and Beck-Fulgham were "cutting checks without [the Board's] permission," and that Mayor Roudez showed favorable treatment toward Coffee. [Dkt. 81 at ¶ 28.] Defendants dispute these assertions, but there is no dispute that Wilson spoke to the Will County State's Attorney's Office and the FBI in late October, November and/or December 2021 regarding "what she perceived to be illegalities with the Village administration." [Dkt. 73 at ¶ 31; Dkt. 87 at ¶ 16.] Wilson provided the State's Attorney's Office and/or the FBI with Board meeting packets, board meeting videos and the management agreement for the Golf Club. [Dkt. 81 at ¶ 30.] The parties dispute who was aware of

---

[2]     Wilson objects to the Court's consideration of Krugel's email because the email is not properly authenticated, and she objects to the contents of Krugel's verbal statements about his client on hearsay grounds. Those objections are overruled. "To be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible." *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017). Krugel's oral and written statements about his representation of Coffee are not offered for their truth, but rather for the alleged impact or effect on those who received this information. *See United States v. Cruse*, 805 F.3d 795, 810 (7th Cir. 2015).

Wilson's conversations with any of these entities. [*Id.* at ¶ 29; Dkt. 73 at ¶¶ 32, 33.] Wilson says that the FBI told her to get more identifying information about Coffee. [Dkt. 81 at ¶ 30.]

*Confrontation with Coffee*: On December 16, 2021, Wilson saw Coffee's car parked outside of the Golf Club. [Dkt. 81 at ¶ 31.] Wilson testified that she went to the Golf Club to try to "identify" Coffee and to follow-up on "the stolen property case." [*Id.*, Dkt. 59-1 at 49.] Wilson approached Coffee outside Coffee's office and told Coffee she had come to identify her and "finalize everything." [Dkt. 81 at ¶ 32; Dkt. 59-1 at 40.] Wilson "believed she had probable cause to arrest Coffee for making a false police 911 call" during the November 4 tire changer incident. [Dkt. 81 at ¶ 32.] Coffee told Wilson she would not speak without her attorney present, and turned to walk toward her office. [*Id.* at ¶ 33.]

A physical confrontation ensued between Wilson, Coffee, and a third employee, DeVaughn Mathus, that was captured by video surveillance cameras positioned inside the Golf Club. [Dkt. 63.] Despite the quality of the videos, the parties dispute what occurred, but the details are not material. With the assistance of other officers who arrived to assist, Mathus and Coffee were arrested, handcuffed, and charged with aggravated battery. They were later found not guilty of this offense. [Dkt. 81 at ¶¶ 37–38; Dkt. 59-14.]

*Wilson's Administrative Leave and Termination:* That same day, Wilson met with Mayor Roudez and Beck-Fulgham and was placed on paid administrative leave. [Dkt. 81 at ¶ 39.] The Village Attorney initiated an investigation into Wilson's

conduct to determine "if her actions violated any rule, regulation or policy of the Village, as well as determine if her actions violated any law or constitutional right" from November 4 until December 16, 2021 "just prior to the arrest of Ms. Coffee and Mr. Mathus." [Dkt. 67.] The investigation included a review of 115 videos generated between November 4 and December 16, witness statements from Mathus, Putnam and others, police reports, and an interview of Wilson herself on January 27, 2022, pursuant to the Uniform Peace Officers' Disciplinary Act, 50 ILCS 725/1. [*Id.*][3]

While the investigation was pending, Wilson filed a complaint with the EEOC on February 17, 2022. [Dkt. 81 at ¶ 42.] The charge alleged retaliation, sex discrimination, and "workplace violence." [Dkt. 77-12.] Wilson's narrative stated that she had been "subject to different terms and conditions of employment in retaliation for being a witness to [Kitching's] sexual harassment claim and EEOC charge," "investigating potentially improper Village conduct," and "arresting and pressing charges against [Coffee and Mathus]." [*Id.*] The filing referenced Beck-Fulgham "confronting" Wilson about the Kitching incident and that Coffee "battered and assaulted" Wilson on December 16. Wilson stated she had been placed on administrative leave and that an investigation had been "launched" into her conduct.

---

[3]     At her deposition, Wilson testified that she spoke about "going to the State's Attorney's Office and the FBI Office" during the January 27, 2022 "interrogation," but no reasonable juror could conclude that this was true. [Dkt. 59-1 at 70.] As Defendants point out, Wilson's interview was transcribed, and it contains no testimony about speaking with the FBI or the State's Attorney. [Dkt. 73-6.] This evaporates any factual dispute that would otherwise exist. *Kailin v. Vill. of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023).

A report of the results of the Village's internal investigation was issued on March 3, 2022.[4] It concluded that Wilson violated various University Park Police Department policies including Policies 1.001 and 1.002 concerning written directives and procedures and department goals and objectives; Policy 2.001 concerning ethics; Policy 2.00VI and X concerning on and off duty conduct; and finally a violation of Personnel Manual Group III for deliberately misusing, destroying or damaging Village property. [*Id.* at ¶ 41; Dkt. 67 at 15–19.]

On March 22, 2022, the Board of Trustees held an executive session regarding the future of Wilson's employment. Beck-Fulgham recommended that Wilson receive the option to retire or be terminated. [Dkt. 81 at ¶ 43.] It is disputed whether the Board "reached the proper consensus" for this decision. In a letter dated April 1, 2022, Beck-Fulgham notified Wilson that the Village would accept her retirement if she provided written notice of retirement by a date certain. [*Id.* at ¶ 44; Dkt. 68.] Wilson did not submit notice in the time allotted, so she was terminated on April 5, 2022. [Dkt. 81 at ¶ 44.]

Wilson did not receive a hearing with the Board of Trustees either before or after her termination. [Dkt. 87 at ¶ 30.] The Board did not hold a formal vote

---

[4] Wilson disputes the admissibility of the report of investigation on hearsay grounds, arguing that it does not fall within the business records exception of FRE 803(6). Setting aside whether the investigation report was made in the normal course of business as required by the exception, most of the report does not contain inadmissible hearsay. The portions of the report that rely on statements from Wilson are admissions of a party opponent under Rule 801(2). The videos contain no audio so these recordings do not implicate hearsay. As to those sections of the report that summarize information learned from interviews of Chellios, Putnam and Mathus, no hearsay exception appears to apply, so the Court will not rely on that information to decide the motions.

regarding Wilson's termination, and her termination was not referred to the Board of Fire and Chief Commissioners for a decision. [*Id.* at ¶¶ 35, 37.] Wilson received a "payout" after her termination, but the parties dispute whether she received the appropriate amount. [Dkt. 81 at ¶ 46–47.]

## III. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). When reviewing cross-motions for summary judgment, all facts and reasonable inferences are construed in favor of the party "against whom the motion under review was made." *Frazier-Hill v. Chicago Transit Auth.*, 75 F.4th 797, 801 (7th Cir. 2023). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch|Rea Partners*, 27 F.4th at 1249. The Court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (internal quotation omitted). But defeating summary judgment requires evidence, not mere speculation. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021

10

## IV.    Analysis

Wilson's First Amended Complaint [Dkt. 20] brings retaliation claims under Title VII (Count I), the IHRA (Count II), and the Fourteenth Amendment (Count VII).[5] She also brings Fourteenth Amendment due process claims arguing she had a protected property interest in her position as police chief (Count III) and in her position as a police officer (Count IV). Her remaining claims are for a writ of mandamus (Count V); a *Monell* violation (Count VIII); an Illinois Whistleblower Protection Act claim (Count IX); replevin under Illinois law (Count X); an Illinois Wage Payment and Collection Act claim (Count XI); and an indemnification claim (Count XII).

### A.    Retaliation Claims

"To survive summary judgment on a Title VII retaliation claim, a plaintiff must produce evidence from which a reasonable juror could find that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the two." *Alley v. Penguin Random House*, 62 F.4th 358, 361 (7th Cir. 2023) (citing *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018)).

---

[5]    Count VII is duplicative of Counts I and II. All three claims are based on the same set of facts and to the extent that Plaintiff intended to bring a standalone Fourteenth Amendment Claim through Count VII, this does not appear to be a recognized cause of action in the Seventh Circuit. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 374 n.2 (7th Cir. 2020) ("an equal protection claim, if based on the same allegations underlying [plaintiff's] Title VII claim, would not be tenable here. The right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause.") (quoting *Boyd v. Ill. State Police*, 384 F.3d 888, 898 (7th Cir. 2004)) (cleaned up). Wilson does not engage with this argument in her response brief. Because the Fourteenth Amendment is not the proper vehicle for a standalone retaliation claim based on the facts presented here, and because the merits of these claims are addressed in the Court's analysis of Counts I and II, summary judgment is granted for Defendants as to Count VII.

When analyzing IHRA claims, "Illinois courts apply the federal Title VII framework." *Volling v. Kurtz Paramedic Servs., Inc.,* 840 F.3d 378, 383 (7th Cir. 2016).

Although her complaint suggests several acts of retaliation, Wilson's opposition brief focuses on only one protected activity: her February 2022 EEOC charge. [Dkt. 82 at 5.] Wilson claims to have "sent a copy of her EEOC charge to the then Village Attorney right after it was filed," but there is no evidence in the record to support this statement. [Dkt. 77; Dkt. 87 at ¶ 34.] Regardless, for summary judgment purposes, the first two elements are satisfied—Wilson's EEOC charge was protected and her termination was an adverse action.

Turning to causation, Title VII requires evidence of "but-for" causation. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). To show but-for causation, Wilson must establish that her termination "would not have occurred in the absence of" her protected activity. *Robinson v. Perales*, 894 F.3d 818, 830 (7th Cir. 2018) (quotations omitted). Relevant evidence may include "suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019) (quotations omitted). Under the framework established in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016), the Court considers the evidence as a whole.

Wilson relies on suspicious timing, which—standing alone—creates an inference of causation when "an adverse employment action follows close on the heels of protected expression." *See Adebiyi v. S. Suburban Coll.*, 98 F.4th 886, 892 (7th Cir.

12

2024) (quoting *Kingman v. Frederickson*, 40 F.4th 597, 603 (7th Cir. 2022)).; *see also Kidwell v. Eisenhauer*, 679 F.3d 957, 969 (7th Cir. 2012) (explaining that in the Seventh Circuit, for an inference of causation to be drawn solely on the basis of a suspicious-timing argument, "we typically allow no more than a few days to elapse.") Wilson argues that the close proximity between her EEOC complaint and her termination supports an inference of causation when viewed in light of the internal investigation, the timing of which Wilson says is "highly suspicious." [Dkt. 82 at 6-7.] The Court cannot agree.

As noted, for an inference of causation to be drawn based solely on timing, courts "typically allow no more than a few days to elapse between the protected activity and the adverse action." *Kidwell*, 679 F.3d at 966. Here, six weeks had passed between the EEOC complaint filed on February 17, 2022, and Wilson's termination in early April 2022. This timing alone would not support an inference of causation. *Kingman*, 40 F.4th at 603 (retaliation claim properly dismissed at summary judgment where three months separated a plaintiff's critical statement and his termination); *Sweet v. Town of Bargersville*, 18 F.4th 273, 279 (7th Cir. 2022) ("[E]ven if November rather than January is the relevant point in time, we're left with a three month gap—still too long to support an inference of retaliatory motive."); *Milligan v. Bd. of Trs. of S. Illinois Univ.*, 686 F.3d 378, 390 (7th Cir. 2012) (finding a two-month gap insufficient); *Shreffler v. City of Kankakee*, 2024 WL 1826976, at *9 (7th Cir. 2024) (same).

Additional evidence could strengthen a causal connection based on suspicious timing, but Wilson provides none. When "there are reasonable, non-suspicious explanations for the timing of the defendant's conduct, proximity in time is not enough to support a retaliation claim." *Alley*, 62 F.4th at 362 (cleaned up). Here, Wilson had already been placed on administrative leave for the events of December 2021 by the time she filed her EEOC complaint, meaning that the Village already began its investigation into potential misconduct in December 2021 well before her protected act in February 2022. The report of investigation, issued on March 3, 2022, concluded that Wilson violated four Village policies based on the events of November 4 and December 16. [Dkt. 67.] The Board of Trustees held an executive session on March 22, and Wilson was notified of the option to retire or be terminated on April 1; her termination followed a few days later. [Dkt. 81 at ¶ 43.] Viewed in context, no reasonable factfinder could draw a suspicious inference about the timing of Wilson's termination. *Alley*, 62 F.4th at 362 (summary judgment appropriate where employer provided a "perfectly reasonable explanation for the timing of Alley's demotion": it learned of her failure to comply with a reporting obligation and then took the adverse action despite her attempted efforts at a protected activity.) Stated differently, Wilson has not provided any supporting evidence that would allow a jury to assign significance to her EEOC filing, leaving nothing to bridge the gap between that filing and her termination. *Adebiyi*, 98 F.4th at 893.

Wilson also argues that the investigation itself was pretextual, but this is unavailing. "When evaluating a plaintiff's evidence of pretext, it is not the court's

14

concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was a lie." *Adebiyi*, 98 F.4th at 893 (citing *Parker v. Brooks Life Sci., Inc.*, 39 F.4th 931, 937–38 (7th Cir. 2022)) (cleaned up); *Galvan v. Indiana*, 117 F.4th 935, 939 (7th Cir. 2024) ("The focus is not on the wisdom of the decision, but on its genuineness.")

As already discussed, the evidence the Village points to as a non-retaliatory reason for termination were Wilson's "involvement in a series of events that occurred at [the Golf Club] on November 4, 2021 and December 16, 2021," as articulated in Wilson's termination letter. [Dkt. 86 at 4; Dkt. 68.] The letter explained that the Village Attorney investigated Wilson's involvement in the tire changer incident including her attempt to open the Golf Club garage with a crowbar on November 4, and her efforts to speak with Coffee in a law enforcement capacity knowing that Coffee was represented by counsel. [Dkt. 68.] The letter detailed that the investigation concluded Wilson had violated various Village policies, including through her attempts to speak with Coffee, and that those results had been shared with Beck-Fulgham and the Board of Trustees. [Dkt. 67 at 17; Dkt. 68.]

To show that this explanation was a lie, Wilson points to what she describes as "inconsistencies creating genuine issues of material fact," including the Village's failure to discipline "the employee who accessed the Golf Course garage," which Wilson argues "cast[s] doubt on the legitimacy of Wilson's alleged 'forced entry' as a justification for her firing." [Dkt. 82 at 8–9.] And she says that Chellios, the interim

Village Manager, gave Wilson "the discretion to handle the Golf Course matter," a fact not accounted for during the investigation. [*Id.*]

Wilson cites to no evidence in the record to support the assertion that the employee who accessed the Golf Course garage was never disciplined. [Dkt. 86 at 5.] Even assuming there were inconsistencies in the investigation and that the Village was mistaken about Wilson's misconduct, this alone would not show pretext. Her argument that the investigation was inadequate because it relied on incomplete or even inaccurate information is not enough to survive summary judgment because she has not pointed to evidence that calls into question the *sincerity* of the Village's rationale. Pretext requires Wilson to show insincerity, not mistake. *Tanner v. Board of Trustees of Univ. of Illinois*, 2024 WL 4601046 (7th Cir. 2024). ("even if we assume that Tanner is correct and that the Ethics Office was lied to by some of the people it interviewed, she needs to show insincerity, not mistake."); *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) ("To show pretext, a plaintiff must do more than simply allege that an employer's stated reasons are inaccurate; [she] must still have some circumstances to support an inference that there was an improper motivation proscribed by law.") (cleaned up).

In a single paragraph of her brief, Wilson also references shifting explanations from standard practices as evidence of pretext. "If an employer's explanation for the challenged employment decision has been 'shifting or inconsistent' this may be evidence of pretext." *Parker v. Brooks Life Sci. Inc.*, 39 F.4th 931, 938 (7th Cir. 2022) (quoting *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir.

16

2003)). But here, Wilson has not identified the supposed inconsistency. She merely cites to Beck-Fulgham's deposition testimony concerning the reasons for Wilson's termination, arguing that Beck-Fulgham "could not definitively state how Wilson violated any policies, instead relying on vague statements about Wilson's 'personal motives' without offering concrete evidence." [Dkt. 82 at 10; Dkt. 87 at ¶ 29.] Nor has Wilson explained how any shifting explanation would permit an inference of pretext. If Beck-Fulgham's deposition testimony contains an inconsistency that allows for such an inference, Wilson has not identified it and the Court declines to hunt for it.

Lastly, Wilson briefly argues that the Village "ignored its 'progressive discipline' policy and terminated Wilson for her first offense," which was a deviation from an established policy. [Dkt. 82 at 10.] Like her shifting explanations argument, Wilson has not meaningfully developed this point or cited to any evidence in the record that supports her claim of a deviation from the discipline policy. To be sure, Wilson does not even say what the Village's progressive discipline policy *is* in relation to terminations, so she has not established any difference in how she was treated as compared to others. Without evidence about the Village's termination procedures, Wilson can only speculate about deviations, which is insufficient to create a factual dispute at summary judgment.

Although Wilson maintains that the investigation into her conduct should have reached a different result and that the timing of that investigation together with her EEOC filings and eventual termination is sufficient to establish causation, no reasonable juror could find that her termination was due to her engagement in a

protected activity and "would not have occurred" in its absence, even when viewed as a whole. *Ortiz*, 834 F.3d at 765. Thus, her retaliation claims fails.

### B. First Amendment Retaliation Claim

Count VI raises a First Amendment retaliation claim. The elements for unlawful First Amendment retaliation are the same, that (1) she engaged in constitutionally protected speech; (2) she suffered a deprivation likely to deter her from exercising her First Amendment rights; and (3) there was a causal link. *Int'l Ass'n of Fire Fighters, Local 365 v. City of East Chicago*, 56 F.4th 437, 446 (7th Cir. 2022) (citing *Cage v. Harper*, 42 F.4th 734, 741 (7th Cir. 2022)). The burden for causation is lower for a First Amendment retaliation claim, which requires only that the protected activity was a "motivating factor" in the employment decision. *Manuel v. Nalley*, 966 F.3d 678, 680 (7th Cir. 2020). Once the plaintiff makes this showing, "the burden shifts to the government employer to produce evidence that it would have [taken the disputed action] even in the absence of the protected speech." *Kingman*, 40 F.4th at 601. If the employer carries that burden, a plaintiff must "persuade the factfinder that the defendant's proffered reasons were pretextual." *Id.* at 602.

Wilson does not expressly identify her constitutionally protected speech or explain the link between that activity and her termination. [Dkt. 82 at 16–17.] The closest she comes is by saying that "the content of [her] speech involved exposing corruption and mismanagement within the Village," and that her complaints to the FBI and State's Attorney as well as her EEOC charge "were followed by her removal from her position and eventual termination." [*Id.*] She says that "the record clearly shows that Wilson was subjected to adverse actions directly after engaging in

18

protected speech," in that she was treated differently than Beck-Fulgham, and that her complaints "were followed by her removal from her position and eventual termination." [*Id.*]

For the reasons already discussed, the timing of Wilson's EEOC Complaint, which is constitutionally protected speech, as compared to her termination in April 2022 did not "follow[] close on the heels of protected expression." *Kidwell*, 679 F.3d at 966. Even assuming that Wilson could pinpoint complaints she made to law enforcement exposing corruption and mismanagement within the Village, those complaints are even further removed in time from her termination because they occurred in December 2021 at the latest, further weakening any inference of causation. [Dkt. 81 at ¶¶ 29–30.] And, as discussed, Wilson's confrontation with Coffee and the results of the internal investigation mean that no reasonable factfinder could draw a suspicious inference about the timing of Wilson's termination. In short, there is insufficient evidence to create a dispute of material fact as to causation under the First Amendment. Thus, the First Amendment retaliation claim also fails.

### C.    Due Process Violations

Both parties move for summary judgment on Wilson's due process claims. Count III alleges a § 1983 due process violation for Wilson's removal as police chief. Count IV alleges a § 1983 due process violation for Wilson's termination as a police officer. To establish a viable due process claim, Wilson must show that she was deprived of a protected property interest. *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 399 (7th Cir. 2015).

### 1.    Continued Employment as Police Chief

To show a protected property interest in the public employment context, Wilson must "show more than a unilateral expectation of a job on her part; she must have had a legitimate claim of entitlement to it." *Bounds v. Country Club Hills Sch. Dist. 160*, 64 F.4th 926, 929 (7th Cir. 2023) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). State law provides the source of the protected property interest. *Id.* (citing *Cromwell v. City of Momence*, 713 F.3d 361, 363–64 (7th Cir. 2013)); *Miyler v. Vill. of E. Galesburg*, 512 F.3d 896, 898 (7th Cir. 2008) ("property interests are created and defined by an independent source, such as state law or a contract.").

"[P]rocedural guarantees do not establish a property interest protected under the Fourteenth Amendment's Due Process Clause." *Miyler*, 512 F.3d at898. Rather, to create a property interest, a statute or ordinance must provide "some substantive criteria limiting the state's discretion." *Id.* A statute "which merely provides procedures to be followed does not include a substantive right." *Id.* (quoting *Cain v. Larson*, 879 F.2d 1424, 1426 (7th Cir. 1989); *Catinella v. Cnty. of Cook, Illinois*, 881 F.3d 514, 518 (7th Cir. 2018) ("an employee manual or policy handbook that specifies a set of pre-termination procedures does not create an enforceable property right to a job.").

Wilson relies on 65 ILCS 5/10-2.1-17 as the foundation of her constitutionally protected property right to continued employment as the police chief. [Dkt. 60 at 8-9.] Under that provision, "no officer or member of the ... police department" may be removed "except for cause." 65 ILCS 5/10–2.1–17. If the employee to be removed is an

appointed police chief, she can be removed by the "appointing authority" itself. *Id*. Such a termination is complete once (1) the appointing authority files the reasons for the removal with the "corporate authorities," and (2) those authorities approve the termination by a majority vote. *Id*.

There is no dispute that the Act's removal provisions applied to Wilson at the time she was terminated, so the "question becomes whether 65 ILCS 5/10–2.1–17 limited the [village's] right to terminate [Wilson] in any substantive way." *Burge v. Rogers*, 2015 WL 4692421, at \*3 (N.D. Ill. Aug. 6, 2015). The Court agrees with Defendants that they did not. Wilson could be terminated simply by the appointing authority filing the reasons for removal with the "corporate authorities," and those authorities approving the termination by a majority vote. 65 ILCS 5/10–2.1–17. Because these requirements did not limit the Village's discretion in any substantive way, Wilson had no constitutionally protected property right in continued employment as police chief under this section. *Miyler*, 512 F.3d at 898–99.[6]

Nor is the Court persuaded by Wilson's argument that her "long service and Village practices implied an expectation of continued employment, necessitating due process before termination." [Dkt. 82 at 14.] Seventh Circuit caselaw squarely forecloses the argument. *Catinella*, 881 F.3d at 518. And this case is wholly distinguishable from *Bradley v. Village of University Park*, 59 F.4th 887 (7th Cir.

---

[6]    Wilson's opening brief also cites to Section 3.1-35-10 of the Illinois Municipal Code as another source of her constitutionally protected property right. [Dkt. 60 at 9.] Defendants explain, and Wilson does not argue otherwise, that the Village operates as a managerial form of government subject to Article 5 of the Illinois Municipal Code such that Section 3.1-35-10 does not apply. [Dkt. 72 at 4.]

2023), on which Wilson alternatively relies. Unlike *Bradley*, Wilson never signed a contract with the Village, so it is undisputed there was "no contract governing the terms of her employment as Police Chief." [Dkt. 81 at ¶ 7.] And in *Bradley*, the Village conceded that Bradley had a property interest in his job for purposes of that case. 59 F.4th at 893. The Village makes no such concession here.[7]

Because there is no genuine question of fact concerning whether Wilson had a legitimate claim of entitlement to continued employment as Chief, summary judgment is granted on this claim.

### 2.     Continued Employment as a Police Officer

Wilson's claim that she had a continued property interest in her employment as a police officer fares no better. Her brief does not meaningfully engage with the protected property interest caselaw, or otherwise explain why she is entitled to summary judgment on this claim. [Dkt. 60.] The Court agrees that Wilson has failed to establish a due process violation of any protected property interest in continued employment as a police officer when she was terminated as chief. [Dkt. 72 at 5.]

Defendants look to 65 ILCS 5/10-2.1-4 for the criteria required for a police chief like Wilson to be considered "furloughed" from her prior police officer position such that she could revert to her prior rank and receive her pension. [Dkt. 65 at 11–12.] Section 10-2.1-4 states that "if a member of the department is appointed chief of police

---

[7]     Wilson has not brought a state law defamation claim, so the Court disregards her newly raised argument that she was "defamed" and thus "denied a name-clearing hearing, violating her due process rights," a proposition for which she cites no authority. [Dkt. 82 at 14.] A plaintiff may not amend her complaint through a response brief. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 448 (7th Cir. 2011).

or chief of the fire department *prior* to being eligible to retire on pension, [she] shall be considered as on furlough from the rank [she] held immediately prior to [her] appointment as chief. If [she] resigns as chief or is discharged as chief *prior* to attaining eligibility to retire on pension, [she] shall revert to and be established in whatever rank [she] currently holds . . . and thereafter be entitled to all the benefits and emoluments of that rank, without regard as to whether a vacancy then exists in that rank." Defendants also rely on *Szewczyk v. Bd. of Fire & Police Comm'rs of Vill. of Richmond*, for the proposition that the right to a hearing before the Board of Fire and Police Commissioners—"where the Village proves the charges and the chief is given an opportunity to present a defense,"—is "among the benefits and emoluments of [the police chief's] previous rank of sergeant." 953 N.E.2d 967, 978 (Ill. Ct. App. 2011). The *Szewczyk* court found the police chief had not reverted to the position of sergeant "upon his discharge as police chief because he had attained eligibility to retire on pension." *Id.*

The undisputed facts show that Wilson did not meet the criteria necessary to revert to her police officer rank: Wilson was already eligible to retire on a pension at the time she was appointed chief in March 2020. [Dkt. 81 at ¶¶ 1, 45,46.] As such, she was not considered "as on furlough" from her prior police officer rank and could not "revert" to her prior rank. Nor does she dispute the Village's reliance on *Szewczyk* concerning a right to a hearing before the Board of Fire and Police Commissioners. Wilson has not established a continued property interest in her employment as a

23

police officer, so summary judgment is appropriate in favor of the Village on this claim.[8]

### D. Writ of Mandamus

Although the Court grants summary judgment on Wilson's federal claims, it exercises its discretion to retain supplemental jurisdiction over her remaining state law claims because discovery has already been completed and the pendent state claims are straightforward. 28 U.S.C. § 1367(a); *RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479–80 (7th Cir. 2012) (presumption that federal court will relinquish remaining state claims is displaced when "substantial judicial resources have already been committed" or "it is absolutely clear how the pendent claims can be decided.")

Wilson seeks a writ of mandamus to compel the Village to restore her as police chief because she was not properly removed or alternatively, "to compel the Village to restore her to the rank of sergeant." [Dkt. 20 ¶¶ 118, 119.] Defendants argue that Wilson does not have a right to the relief she seeks through mandamus. [Dkt. 65 at 12–13.] The Court agrees.

Under Illinois law, "[m]andamus is an extraordinary remedy," and "[a] writ of mandamus will be awarded only if the petitioner establishes a clear right to the relief requested, a clear duty of the public official to act, and clear authority in the public

---

[8]     To succeed on a *Monell* claim seeking to hold the Village liable for constitutional violations, a plaintiff must show the deprivation of a federal right. *Helbachs Café LLC v. City of Madison*, 46 F.4th 525, 530 (7th Cir. 2022) (citing *Monell v. Department of Social Services*, 436 U.S. 658 (1978)). Wilson's *Monell* claim cannot survive summary judgment in the absence of an underlying violation of federal law.

official to comply with the writ." *People ex rel. Alvarez v. Howard*, 72 N.E.3d 346, 350 (Ill. 2016); *Pate v. Wiseman*, 143 N.E.3d 248, 255 (Ill. Ct. App. 2019). A writ of mandamus "cannot be used to direct a public body to reach a particular decision or to exercise its discretion in a particular manner." *Szewczyk v. Bd. of Fire & Police Comm'rs of Vill. of Richmond*, 885 N.E.2d 1106, 1111 (Ill. Ct. App. 2008) (quoting *Jamison v. City of Zion*, 834 N.E.2d 499, 503 (Ill Ct. App. 2005)). In other words, "mandamus is proper when one seeks to compel a public officer to perform duties which are purely ministerial in nature and which require no exercise of judgment on the part of the public officer." *Baldacchino v. Thompson*, 682 N.E.2d 182, 188 (Ill. Ct. App. 1997).

Defendants cite to the Village's municipal code, which provides that the Village manager "may remove or discharge [the Police Chief], but only after having reported the reasons for that action to the Village Board and having the Village Board confirm the Manager's decision." [Dkt. 65 at 13, citing Codified Ordinances of University Park § 220-05.] Defendants maintain that Beck-Fulgham adhered to these requirements "by providing the Trustees with a copy of the investigation report into Wilson and issuing her recommendation that Wilson be given the option to retire or be terminated." [*Id.*]

Wilson does not discuss these points in her briefs. Reinstating Wilson to any prior position through a mandamus, as she seeks, would require more than a mere ministerial task. It would amount to the Court directing "a public official or body to reach a particular decision or to exercise its discretion in a particular manner, even

if the judgment or discretion has been erroneously exercised." *Mabwa v. Mendoza*, 19 N.E.3d 1252, 1257 (Ill. App. Ct. 2014) (quotations omitted); *see also McFatridge v. Madigan*, 989 N.E.2d 165, 170 (Ill. 2013) ("A writ of mandamus is appropriate when used to compel compliance with mandatory legal standards but not when the act in question involves the exercise of a public officer's discretion."). Because Wilson has not established a clear right to the requested relief, summary judgment is appropriate on this claim.

### E.    Illinois Whistleblower Protection Act

Defendants move for summary judgment on Count IX, Wilson's Illinois whistleblower claim. Under Section 15(b) of the IWA, an employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation. 740 ILCS 174/15(b) (eff. Jan. 1, 2008.)[9] To prevail, Wilson must show an adverse employment action by the Village that was in retaliation for Wilson's disclosure to a government or law enforcement agency of a suspected violation of an Illinois or federal law, rule, or regulation. *Sweeney v. City of Decatur*, 79 N.E.3d 184, 188 (Ill. App. 2017).

The Village argues that Wilson did not reasonably believe that the information she reported disclosed a violation of the law. [Dkt. 65 at 17.] In her Complaint, Wilson alleges only that she "oppos[ed] Defendant's unlawful conduct to the Will County

---

[9]    The quoted language comes from the version of the statute that was in effect when Wilson was employed with the Village. Amended language took effect on January 1, 2025. *See* 2024 Ill. Leg. Serv. 103-867 (H.B. 5561) (West).

26

State's Attorney's Office, F.B.I., the EEOC, and the Illinois Department of Human Rights. See 740 ILCS 174/15(b)." [Dkt. 20 at ¶ 160.] In her response brief, she maintains that "the information she disclosed" concerned unlawful activities "such as misuse of public funds and other irregularities." [Dkt. 82 at 19.] According to Wilson, her disclosures were "based on firsthand observations and detailed accounts of suspicious activities, including the unexplained presence of [Golf Club] employees at the Village Hall and improper handling of equipment and funds." [Dkt. 82 at 19.]

None of these statements identify *what information* Wilson disclosed concerning a suspected violation of the law. In her Local Rule 56.1 statement of additional facts, Wilson states only that "she communicated with the FBI and the Will County State's Attorney's Office in late October or early November 2021 and went again to the FBI about one week before the December 16, 2021 Golf Course incident." [Dkt. 87 at ¶ 16.] Even assuming that Wilson "believed something unlawful was happening at the Golf Club," and that she provided the State's Attorney and the FBI with Village Board meeting packets, board meeting videos and the Golf Club's management agreement, (see dkt. 81 at ¶¶ 28–30), these are not facts from which a jury could conclude that Wilson reasonably believed she disclosed a suspected violation of the law within the meaning of Section 15(b). Simply put, she has not pointed to any statements she made or information she provided *concerning a suspected violation of the law*. Summary judgment is the proverbial "put up or shut up" moment in a lawsuit. *Ellison v. United States Postal Serv.*, 84 F.4th 750, 759 (7th Cir. 2023). At this stage, Wilson may no longer rest on her pleadings or her beliefs.

She must point to specific evidence in the record to convince a jury and because she has not done so, the Court grants summary judgment on this claim.

### F.    Replevin

Count X seeks an order of replevin under Illinois law. In Illinois, "[w]henever any goods or chattels have been wrongfully distrained, or otherwise wrongfully taken or are wrongfully detained, an action of replevin may be brought for the recovery of such goods or chattels, by the owner or person entitled to their possession." 735 ILCS 5/19-101.

To state a claim, a plaintiff must allege that (1) she is lawfully entitled to possession of the property, (2) that the defendant is wrongfully detaining the property, and (3) that defendant has refused to surrender possession of the property to plaintiff. *Signature Fin. LLC v. Auto Trans Grp. Inc.*, 2018 WL 1914557, at *3 (N.D. Ill. Apr. 23, 2018) (citing *Carroll v. Curry*, 912 N.E.2d 272, 275 (Ill. Ct. App. 2009)). If a plaintiff states a claim, the Court conducts a hearing to determine whether to issue an order of replevin. *Evergreen Marine Corp. v. Div. Sales, Inc.*, 2003 WL 1127905, at *5 n.4 (N.D. Ill. Mar. 12, 2003) (citing *Harris Graphics Corp. v. F.C.L. Graphics*, *Inc.*, 1987 WL 13433, at *1 (N.D. Ill. 1987)). If a plaintiff demonstrates a prima facie case for possession and a probability of success on the merits, the Court issues an order of replevin. *Id.* (citing 735 ILCS 5/9–107). If issued, a plaintiff can post a bond and take possession of the property, or the defendant can post a bond and retain possession. *Id.* (citing 735 ILCS 5/9–109, 112). "[T]he court then holds a trial on the merits and enters a final judgment." *Id.*

28

Wilson's complaint identifies with specificity five categories of personal property items she says were not returned to her. [Dkt. 20, ¶ 167.] Defendants counter that Wilson has pointed to no evidence that the Village has unlawfully retained or is otherwise in possession of this property. [Dkt. 86 at 13–14.] The Court does not agree.

Wilson's Local Rule 56.1 statement of additional facts summarizes the personal items he says were in her office and never returned to her. [Dkt. 87 at ¶ 25.] Wilson alleges that she filed a police report, that her counsel sent an email to the Village attorney about the missing items, and that the items remain unreturned. She also cites to her sworn deposition testimony. *Id.* Because Defendants deny retaining her property, Count X is not appropriate for resolution at the summary judgment stage. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

The parties have now had the benefit of fact discovery, so the Court will hold a hearing that provides Wilson the opportunity to make a prima facie showing on replevin and that provides Defendants an opportunity to assert any defenses. The motion for summary judgment is denied as to this claim.

## G. Illinois Wage Protection Act

Finally, Count XI is Wilson's claim for violation of the Illinois Wage Payment and Collection Act. To prove a claim under the Act, a plaintiff must prove that: "(1) the defendant was an 'employer' as defined in the Wage Payment Act; (2) the parties entered into an 'employment contract or agreement'; and (3) the plaintiff was due 'final compensation.'" *Bradley*, 59 F.4th at 903; 820 ILCS 115/2, 5. The Wage Payment and Collection Act "requires only an 'agreement,' which the courts interpret more

broadly than a contract. An agreement 'requires only a manifestation of mutual assent . . . without the formalities and accompanying legal protections of a contract.'" *Bradley*, 59 F.4th at 903.

Wilson alleges that "according to Village Ordinance," in addition to her final payout after her termination, she was entitled to receive severance payments, including payments for accrued sick leave and floating holidays. [Dkt. 20 at ¶¶ 173–176.] Defendants counter that Wilson received a final payout after her termination and that the remaining payments she seeks are not permitted under the Act. [Dkt. 65 at 18–19.]

> Defendants rely on § 250-12 of the University Park Municipal Code:
>
> (a) If a full-time employee is terminated by the Manager during such time that the employee is willing and able to perform his or her duties as set forth in these Codified Ordinances, the Village shall pay that employee a lump sum cash payment in accordance with the following schedule: One (1) week aggregate salary for each year of service completed, up to a maximum of fifteen (15) weeks.
>
> (b) If an employee is terminated . . . for cause, the Village shall have no obligation to pay the severance pay designated in subsection (a) hereof.

[Dkt. 65 at 19.] Defendants point to Wilson's termination letter to establish that, under (b), Wilson was terminated for cause. [*Id.*; Dkt. 68.] Wilson disagrees, arguing that because there "was no proper adjudication before a neutral body to establish 'just cause' for [her] termination," she is entitled to severance pay equal to four months of her regular salary, together with floating holidays, sick time, and other accrued benefits. [Dkt. 82 at 21; Dkt. 87, ¶ 37.]

Wilson has not shown any entitlement to a "proper adjudication before a neutral body to establish just cause for the termination." Wilson's brief says "proper

adjudication" was required, but she has not identified any statutory or other authority supporting her assertion that she could only be terminated in this way. Indeed, her brief does not even identify the source of any "neutral body" requirement or the basis for her use of the phrase "just cause" when the statute says, "for cause."

Simply put, Wilson's naked assertion that the termination letter's "stated reasons do not meet the criteria for 'just cause' under the law" won't do. The Court is unaware of any evidence in the record that supports Wilson's arguments, and if there is any, Wilson certainly has not pointed to it. The Court must draw reasonable inferences in Wilson's favor, but "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Herzog v. Graphic Packing Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014). Nor may she "manufacture a genuine issue of material fact by speculating about evidence not in the record." *Ellison*, 84 F. 4th at 759.

On this record, no reasonable jury could conclude that there was an agreement entitling Wilson to additional severance or payment for floating holidays, sick time, or other accrued benefits under § 250-12(a) given her "for cause" termination under § 250-12(b). Defendants are entitled to summary judgment on this count as well.

## V.     Conclusion

Defendants' motion for summary judgment is granted in part and denied in part.[10] Wilson's partial motion for summary judgment is denied in its entirety.

Enter: 22-cv-6020
Date:  January 24, 2025

_____

    Lindsay C. Jenkins
    United States District Judge

---

[10]     Because Wilson's replevin claim survives summary judgment, so does her indemnification claim.